UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

STAN BITTERS, et al.,

        Plaintiffs,

    v.

FEDERAL HIGHWAY
ADMINISTRATION, et al.,

        Defendants.

No.  1:14-cv-01646-KJM-SMS[1]

ORDER

In May 2014, defendant California Department of Transportation ("Caltrans"), acting on behalf of the Federal Highway Administration ("FHWA"), approved federal funds for a project to reintroduce vehicular traffic to the Fulton Mall in Fresno, California in order to revitalize economic activity in the downtown area.  Plaintiffs filed this action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, alleging Caltrans violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, by deciding to not prepare an environmental impact statement ("EIS"), violated NEPA by preparing a deficient

---

[1] Although this case may be best suited for determination by a judge of the Fresno Division of this court, from which it arose, one of the consequences of the Eastern District's caseload and the relatively fewer judicial resources in the Fresno Division is that a judge in the Sacramento Division is called to decide the pending motions.

1

1   environmental assessment ("EA"), and violated Section 4(f) of the Federal Transportation Act

2   ("Section 4(f)"), 49 U.S.C. § 303(c), by preparing a deficient evaluation of the project's use of

3   historic sites and public parks.[2]

4          This matter is before the court on the parties' cross-motions for summary

5   judgment on the three APA claims, ECF Nos. 35, 40, 42, and plaintiffs' motion for a preliminary

6   injunction pending the court's ruling on the summary judgment cross-motions.  ECF No. 47.  The

7   court held a hearing on the summary judgment motions on October 30, 2015, at which Sarah

8   Hedgpeth-Harris and Amy Minteer appeared for plaintiffs; Stephen Onstot appeared for

9   defendant City of Fresno ("the City"); and Judith Carlson appeared for defendant Caltrans.  The

10  court submitted plaintiffs' later preliminary injunction motion as provided by Local Rule 230(g).

11         As explained below, after careful consideration of the record in light of applicable

12  law, the court DENIES plaintiffs' motion for summary judgment and GRANTS defendants'

13  motions for summary judgment.  The court DENIES AS MOOT plaintiffs' motion for a

14  preliminary injunction.

15  I.     PROCEDURAL BACKGROUND

16         Plaintiff Downtown Fresno Coalition ("DFC") is an unincorporated organization

17  dedicated to the revitalization and preservation of the Fulton Mall.  AR 005341, 013230.

18  Plaintiffs and DFC members Patty Bartucci, Herman Patton, and Ray Perez are low-income,

19  disabled, minority residents of the City who live within a few blocks of the Fulton Mall.  They

20  enjoy the trees, artwork, and park-like atmosphere of the Fulton Mall on almost a daily basis.

21  Bartucci Decl. ¶¶ 2, 5; Patton Decl. ¶ 2; Perez Decl. ¶¶ 3–5.  Plaintiff and DFC member Stan

22  Bitters[3] contributed sculptures and fountains to the Fulton Mall when it was first converted into a

23

24         [2] Plaintiffs also assert a claim under California Government Code section 11135, but the
    court stayed litigation of that claim pending resolution of the three APA claims.  ECF No. 27.

25         [3] Bitters has worked in ceramics for approximately sixty years, studying early on with
26  Peter Voulkos at the Otis College of Art and Design in Los Angeles.  His work has been included
    in a relatively recent design retrospective at the Craft and Folk Art Museum in Los Angeles, and
27  he had a 2014 solo show at Heath Ceramics in San Francisco.  Stan Bitters, *Wikipedia: The Free
    Encyclopedia* (online ed. Dec. 12, 2015).

28

1    pedestrian mall in the early 1960s.  Bitters Decl. ¶¶ 3, 5; AR 012053, 010027–29.  Plaintiff and

2    DFC member Joyce Aiken[4] contributed mosaic benches to the Mall.  Aiken Decl. ¶¶ 5, 7;

3    AR 010029.  The DFC participated in the formal consultation process with Caltrans under Section

4    106 of the National Historic Preservation Act, 36 C.F.R. §§ 800.1 *et seq.*  AR 002871–79,

5    005341–44.  Defendants have not challenged plaintiffs' standing, and the court's own review

6    finds plaintiffs have established standing.  *Cf. Ecological Rights Found. v. Pac. Lumber*, 230 F.3d

7    1141, 1147–53 (9th Cir. 2000).

8            Plaintiffs filed this action on October 20, 2014.  ECF No. 1.  On January 6, 2015,

9    plaintiffs filed a First Amended Complaint.  First. Am. Compl., ECF No. 7 ("FAC").  The First

10   Amended Complaint asserts four causes of action: (i) violation of NEPA and APA for failure to

11   prepare an EIS for the project; (ii) violation of NEPA and APA for failure to adequately evaluate

12   impacts in the EA; (iii) inadequate Section 4(f) analysis; and (iv) violation of California

13   Government Code section 11135.  *Id.*  The court has stayed litigation of the fourth cause of action

14   pending resolution of the three APA claims.  ECF No. 27, at 2–3.  Caltrans and the City each filed

15   an Answer.  ECF Nos. 16, 17.

16           On August 31, 2015, plaintiffs filed a motion for summary judgment under Rule

17   56(a) of the Federal Rules of Civil Procedure.  Pls.' Mot. Summ. J., ECF No. 35.  The City and

18   Caltrans filed cross-motions for summary judgment under Rule 56(f).  City's Opp'n & Mot.

19   Summ. J., ECF No. 40 ("City's Mot. Summ. J."); Caltrans' Am. Opp'n & Mot. Summ. J., ECF

20   No. 42 ("Caltrans' Mot. Summ. J.").  Plaintiffs filed a joint reply in support of their motion for

21   summary judgment.  Pls.' Reply, ECF No. 44.  Because the alleged inadequacies with the EA also

22

23

24   _____

25       [4] Aiken taught feminist art at California State University, Fresno from 1973 to 1992,
     assuming teaching of the Feminist Art Program class developed by Judy Chicago.  From 2004 to
     2010 she served as Director of the Fresno Arts Council.  Joyce Aiken, *Wikipedia: The Free
26   Encyclopedia* (online ed. Feb. 17, 2015); Judy Chicago, *Wikipedia: The Free Encyclopedia*
     (online ed. Jan. 10, 2016).

27

28

1    serve as the basis for plaintiffs' argument that Caltrans was required to prepare an EIS, the court

2    addresses plaintiffs' two NEPA claims together for purposes of this order.[5]

3    II.    FACTUAL BACKGROUND

4          A.    History of the Fulton Mall

5                Through the end of World War II, Fulton Street was the heart of downtown Fresno

6    and was considered the "Main Street" for commercial and business activity.  AR 001840.[6]

7    During the late 1940s, Fresno's land use patterns began to alter as a result of the expansion of

8    land uses and the movement of residents and businesses to the city's periphery.  *Id.*  As suburban

9    shopping malls opened in the urban fringe, Fresno began to experience the commercial decline of

10   Fulton Street.  *Id.*  In response to this decline, Fresno hired acclaimed shopping mall architects

11   Victor Gruen Associates, Inc.[7] in the late 1950s to develop a plan to rebuild the city's core.  *Id.*

12   Early planning documents stated that Fulton Street was to be "converted into a high-quality dense

13   activity pedestrian mall."  AR 005186.  Modernist architect Garrett Eckbo,[8] who Caltrans

14   recognizes as a "master," *see, e.g.*, AR 005296, implemented Gruen's vision and designed the

15   Fulton Mall, which opened in 1964.  *See* AR 001840.  The Fulton Mall landscape included

16   carefully designed planters and fountains, trees, and works of art commissioned by local artists.

17   ─────────────

18        [5] Plaintiffs' motion for summary judgment focuses on Caltrans' decision not to prepare an EIS, but plaintiffs' reply clarifies that their motion addresses both of their NEPA claims and did not abandon their second cause of action.  *See* Pls.' Reply at 1; *see also* City's Mot. Summ. J. at 2 n.2 (arguing that plaintiffs abandoned their second cause of action by failing to address it in their motion for summary judgment).  The court interprets plaintiffs' motion as providing overlapping arguments regarding the deficiencies of the EA and the need for an EIS under NEPA.

19

20

21        [6] The pages cited here are those printed consecutively throughout the administrative record in red ink in the bottom center of each page.

22

23        [7] Victor Gruen was an Austrian-born and trained architect who came to the United States in 1938.  It was in this country that he pioneered the "regional shopping centre," commonly known as a shopping mall, in the course of working to "solve problems of modern urban areas for mass population."  Victor Gruen, *Encyclopedia Brittanica* (online ed. 2016).

24

25

26        [8] Garrett Eckbo was an American landscape architect who chaired the landscape department at University of California, Berkeley, from 1963 to 1969.  He pioneered modern landscape architecture, including through introduction of asymmetry and abstract designs.  Garrett Eckbo, *Encyclopedia Brittanica* (online ed. 2016).

27

28

1    AR 005186.  To comply with California's Pedestrian Mall Law of 1960, Cal. Sts. & High. Code

2    §§ 11000 *et seq.*, the City adopted an ordinance establishing Fulton Mall as Pedestrian Mall

3    No. 1.  AR 000344–47.  The land that makes up the Mall is owned in fee simple by the owners of

4    the buildings that are adjacent to the Mall,[9] and the City holds a right-of-way easement for the

5    Mall.  AR 005185; *see also* AR 013960.

6             During the 1970s and 1980s, longtime local merchants and department store

7    anchors steadily departed the Fulton Mall for new suburban locations.  AR 005186.  In the early

8    to mid-1990s, property values of the major buildings in the Mall area declined significantly.  *Id.*

9    Today, the Fulton Mall tenant mix is composed of relatively small businesses, and downtown

10   Fresno is more economically depressed than the city as a whole.  *Id.*  Measured against the

11   surrounding downtown area, the Fulton Mall area is even more depressed, in some cases by a

12   factor of three or more.  *Id.*

13            The history of the Fulton Mall is not unique.  Beginning in the late 1950s, an

14   estimated 200 pedestrian malls were installed in cities across the United States.  AR 001643,

15   001842.  According to a study conducted in downtown Memphis, most of the original 200 malls

16   suffered negative economic consequences from the original conversion and nearly 85% have

17   since reopened to vehicular traffic.[10]  AR 001842.

18            B.       Proposed Project

19            The Fulton Mall Reconstruction Project would convert Fulton Mall back to a street

20   by reintroducing vehicle traffic lanes.  AR 005185.  The proposed project includes the pedestrian

21   mall segments at the cross streets of Merced, Mariposa, and Kern.  AR 005189.  The length of the

22   _____

23            [9] The Final EA does not specify which building owners own the land that makes up the
     Mall.  Approximately seventy-three percent of the buildings along the Mall are used as storefronts
24   or offices.  *See* AR 005248.

25            [10] The Fulton Mall Urban Decay Study, upon which Caltrans relies, reviewed several
     third-party studies on the Fulton Mall and surrounding area, as well as case studies on similar
26   projects involving pedestrian malls around the nation, as part of its quantitative and qualitative
     analysis.  *See* AR 001847.  Other methods included on-foot field surveys, surveys of real estate
27   brokers, analysis of real estate and market statistics, and analysis of crime statistics in the study
     area and surrounding area.  *See* AR 001847–48.

28

5

1    proposed project is 0.74 miles, while the width of the existing pedestrian mall is eighty feet.

2    AR 005185.  The project would introduce one eleven-foot-wide vehicle lane in each direction

3    alongside bicycle and potentially other travel modes, additional parking spaces along the length

4    of the Mall, and pedestrian-only space ranging from fourteen to forty-four feet wide on one or

5    both sides of the street, depending on the specific proposal adopted.  *See* AR 005198, 005203.

6    The cost of the project is estimated to be twenty million dollars.  AR 005185.  The project is part

7    of a larger planning effort by the City intended to revitalize the downtown area.  AR 005197.

8    Other planning efforts include the amended 2025 General Plan, Central Area Community Plan,

9    Fulton Corridor Specific Plan, and Downtown Neighborhoods Community Plan.  AR 005195–96,

10   005230–32.

11         The stated purpose of the proposed project is to increase mobility and access in the

12   Fulton Mall study area by providing more convenient multi-modal access options on the Mall and

13   its cross streets; to improve visibility of businesses and other amenities by improving traffic

14   circulation, thereby encouraging additional economic development in the area; and to increase the

15   Fulton Mall study area's consistency with the requirements and goals of proposed land use plans.

16   AR 005189–90, 005360.

17         Caltrans identified several needs for the project.  First, Caltrans found the lack of

18   vehicular traffic and on-street, short-term parking currently limits access to businesses and

19   residences in the study area.  AR 005190.  According to the Economic Impact Analysis prepared

20   for the project, people tend to prefer to reach their shopping or business destinations quickly,

21   especially if they have young children or are elderly or disabled.  *Id.*  About one-half of the Mall

22   is not compliant with current Americans with Disabilities Act ("ADA") standards.[11]  *See*

23   AR 005387, 005625.  Second, Caltrans found the pedestrian-only configuration limits the

24   visibility of businesses from automobiles to what can be seen from a vehicle driving on one of the

25   cross streets.  AR 005190.  As a result, existing businesses must rely on advertising or pedestrian

26   traffic to attract commerce.  AR 005192.  Caltrans found this lack of access and visibility

27

28   [11] The ADA was adopted in 1990, twenty-six years after the Mall's opening.

1    hampers economic development in the Fulton Mall study area.  AR 005194.  The "Pedestrian &

2    Transit Malls Study by Memphis Center City Commission" (2008) listed lack of access and

3    visibility for retail as a factor in the decline of pedestrian malls across the country.  AR 005194.

4    The Fulton Mall study area is more economically depressed than other areas of Fresno, with

5    lower retail sales, higher vacancy rates, and higher crime rates.  AR 005194–95.  Finally, Caltrans

6    found the proposed project is needed to further the goals of the proposed land use plans for

7    Fresno.  AR 005195–96.

8    III.    STATUTORY AND REGULATORY FRAMEWORK

9            Although defendants undertook several environmental review processes to

10   evaluate the development options for the Fulton Mall, the two at issue are the NEPA and Section

11   4(f) processes.

12          A.    NEPA

13          NEPA is the "basic national charter for protection of the environment."  40 C.F.R.

14   § 1500.1(a).  NEPA requires agencies undertaking any major federal action to follow "a set of

15   'action-forcing' procedures that require that agencies take a 'hard look at environmental

16   consequences,' and that provide for broad dissemination of relevant environmental information."

17   *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (quoting *Kleppe*, 427

18   U.S. at 410 n.21).  The Supreme Court has explained that NEPA "ensures that the agency, in

19   reaching its decision, will have available, and will carefully consider, detailed information

20   concerning significant environmental impacts."  *Id.* at 349.  "[I]t is now well settled that NEPA

21   itself does not mandate particular results, but simply prescribes the necessary process," *id.* at 350;

22   thus, "NEPA merely prohibits uninformed—rather than unwise—agency action," *id.* at 351.

23          Among other action-forcing procedures, NEPA requires all agencies of the federal

24   government to prepare a "detailed statement" that discusses the environmental effects of, and

25   reasonable alternatives to, all "major Federal actions significantly affecting the quality of the

26   human environment."  42 U.S.C. § 4332(2)(C).  This statement is commonly known as an

27   environmental impact statement ("EIS").  The Council of Environmental Quality ("CEQ"),

28

7

1    established by NEPA with authority to issue regulations interpreting it, has promulgated

2    regulations to guide federal agencies in determining whether an EIS is required.  *See* 40 C.F.R.

3    § 1500.3.  When an agency does not know whether the effects of its action will be "significant,"

4    CEQ regulations allow an agency to prepare a more limited document, an environmental

5    assessment ("EA"), to help make that determination.  40 C.F.R. §§ 1501.4(b), 1508.9.  The EA is

6    to be a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for

7    determining whether to prepare an [EIS]."  *Id.* § 1508.9(a).  If, based on the EA, substantial

8    questions are raised as to whether a project may have a significant effect on the environment, an

9    EIS must be prepared.  *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 736 (9th Cir.

10   2001), *abrogated on other grounds by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 145

11   (2010); *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998).

12   If not, the agency "must issue a 'finding of no significant impact' (FONSI), which briefly

13   presents the reasons why the proposed agency action will not have a significant impact on the

14   human environment."  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757–58 (2004); *see also*

15   *Monsanto*, 561 U.S. at 145.

16              B.        Section 4(f) of the Department of Transportation Act

17                    Running parallel with, but distinct from, the NEPA process is the Section 4(f)

18   process, prescribed in the federal Department of Transportation Act, 49 U.S.C. §§ 101 *et seq.*

19   "The Department of Transportation Act is intended to preserve historic sites as far as practicable."

20   *HonoluluTraffic.com v. Fed. Transit Admin.*, 742 F.3d 1222, 1232 (9th Cir. 2014).  Section 4(f) of

21   the Act prohibits an agency from approving a project that uses publicly owned land that is a

22   "public park" or "historic site of national, State, or local significance" unless: (1) there is no

23   feasible and prudent alternative to using that land, and (2) the project "includes all possible

24   planning to minimize harm" to the resources.  49 U.S.C. § 303(c); *see also* 23 C.F.R. § 774.3.

25   Section 106 of the National Historic Preservation Act ("Section 106"), 36 C.F.R. §§ 800.1 *et seq.*,

26

27

28

outlines a consultation process by which an historic site's significance is determined.[12] *See* 23 C.F.R. § 774.11; 36 C.F.R. § 800.4.

Prior to approving a project requiring the use of Section 4(f) property, an agency must determine there is no feasible and prudent alternative that avoids using that property.  49 U.S.C. § 303(c)(1).  Section 774.17 of the Code of Federal Regulations defines "feasible and prudent avoidance alternative":

> (1) A feasible and prudent avoidance alternative avoids using Section 4(f) property and does not cause other severe problems of a magnitude that substantially outweighs the importance of protecting the Section 4(f) property . . . .
>
> (2) An alternative is not feasible if it cannot be built as a matter of sound engineering judgment.
>
> (3) An alternative is not prudent if:
>
> > (i) It compromises the project to a degree that it is unreasonable to proceed with the project in light of its stated purpose and need;
> >
> > (ii) It results in unacceptable safety or operational problems;
> >
> > (iii) After reasonable mitigation, it still causes:
> >
> > > (A) Severe social, economic, or environmental impacts;
> > >
> > > (B) Severe disruption to established communities;
> > >
> > > (C) Severe disproportionate impacts to minority or low income populations; or
> > >
> > > (D) Severe impacts to environmental resources protected under other Federal statutes;
> >
> > (iv) It results in additional construction, maintenance, or operational costs of an extraordinary magnitude;
> >
> > (v) It causes other unique problems or unusual factors; or

/////

//////

---

[12] Section 106 also imposes separate substantive requirements on projects that affect historic properties, but those requirements are not at issue in this action.

1

(vi) It involves multiple factors in paragraphs (3)(i) through (3)(v) of this definition, that while individually minor, cumulatively cause unique problems or impacts of extraordinary magnitude.

2

3

4    23 C.F.R. § 774.17.

5         If there is no feasible and prudent avoidance alternative, the agency may approve,

6    from the remaining alternatives that use Section 4(f) property, only the alternative that "[c]auses

7    the least overall harm in light of the statute's preservation purpose." *Id.* § 774.3(c)(1).  The least

8    overall harm is determined by balancing the following factors:

9         (i) The ability to mitigate adverse impacts to each Section 4(f) property . . . ;

10

11        (ii) The relative severity of the remaining harm, after mitigation . . . ;

12        (iii) The relative significance of each Section 4(f) property;

13        (iv) The views of the official(s) with jurisdiction over each Section 4(f) property;

14

15        (v) The degree to which each alternative meets the purpose and need for the project;

16        (vi) After reasonable mitigation, the magnitude of any adverse impacts to resources not protected by Section (f); and

17

18        (vii) Substantial differences in costs among the alternatives.

19    *Id.*

20        In addition, the alternative selected must include "all possible planning" to

21    minimize harm to Section 4(f) property.  49 U.S.C. § 303(c)(2); *see also* 23 C.F.R. § 774.3(c)(2).

22    "All possible planning" means that the project must include all reasonable measures identified in

23    the evaluation to minimize harm or mitigate for adverse impacts and effects.  23 C.F.R. § 774.17.

24    With regard to historic sites, the mitigation measures normally serve to preserve the historic

25    features as agreed by the FHWA and the official with jurisdiction over the Section 4(f) resource

26    in accordance with the Section 106 consultation process.  *Id.*

27

28

10

C.     CEQA

In addition to complying with federal statutes and regulations, defendants must also comply with the California Environmental Quality Act ("CEQA"), Cal. Pub. Res. Code §§ 21000 *et seq*., the state framework for environmental protection.  AR 005185.  Caltrans is the lead agency under NEPA and Section 4(f),[13] and the City is the lead agency under CEQA.  *Id.*; *see also* AR 005353.  If a project may have a significant effect on the environment, CEQA requires state and local agencies to identify mitigation measures and alternatives by preparing an environmental impact report ("EIR").  *See* Cal. Pub. Res. Code § 21002.1.  Plaintiff Downtown Fresno Coalition is currently challenging the City's actions under CEQA in state court in *Downtown Fresno Coalition v. City of Fresno*, California Court of Appeal, Fifth Appellate District, Case No. F070845.[14]  Plaintiffs do not bring any CEQA claims in this action, but the court reviews the project's CEQA process as helpful background to its NEPA and Section 4(f) processes.

IV.     ENVIRONMENTAL REVIEW OF PROJECT

A.     Early Planning and CEQA Process

In 2010, the City began work on the Fulton Corridor Specific Plan ("FCSP"), a planning document intended to guide future development along the Fulton Mall and in the surrounding area.  AR 005047, 005189.  In October 2011, the City published a draft FCSP, which devotes an entire chapter to the future of the Fulton Mall.  AR 001588–833; *see* AR 001642–60.

In June 2013, the City applied to the U.S. Department of Transportation ("DOT") for a grant from the Transportation Investments Generating Economic Recovery program

---

[13] Caltrans assumed responsibility for environmental review of the Fulton Mall Reconstruction Project under NEPA and Section 4(f) as provided by a Memorandum of Understanding with the FHWA.  *See* 23 U.S.C. § 327(a)(2); ECF No. 21-1.

[14] As plaintiffs request, the court takes judicial notice of the opening brief in the state court proceeding under Federal Rule of Evidence 201.  *See* Fed. R. Evid. 201(b)(2), 201(c)(2); Pls.' Ex. A, ECF No. 36; *see also Missud v. Nevada*, 861 F. Supp. 2d 1044, 1054 (N.D. Cal. 2012), *aff'd*, 520 Fed. App'x 534 (9th Cir. 2013) (filings and orders in other court proceedings are judicially noticeable to demonstrate the existence of other court proceedings).

1  ("TIGER program") for a proposed project to reintroduce vehicular traffic to the Fulton Mall,

2  dubbed the Fulton Mall Reconstruction Project.  AR 000150–256.  In August 2013, the DOT

3  announced the City had been awarded nearly sixteen million dollars in TIGER funding for the

4  project.  AR 005185, 008166.  In October 2013, the City decided to prepare a separate EIR under

5  CEQA for the Fulton Mall Reconstruction Project, independent from the EIR for the larger FCSP,

6  to meet the deadlines for environmental review required by the TIGER grant.  *See* AR 005883–

7  84, 008166.

8        In November 2013, the City released the Draft EIR for the Fulton Mall

9  Reconstruction Project for public comment.  AR 008132–425.  The Draft EIR states, "It is in light

10  of the TIGER grant . . . that the City is preparing this new CEQA document, which addresses the

11  project on its own, and is also focused on the Project as being conditioned on the allowed

12  purposes of the TIGER grant funds."  AR 008167.  The Draft EIR concluded the project would

13  cause significant and unavoidable impacts to only two environmental factors: visual character, for

14  five to ten years while replacement trees mature, and historic resources.  AR 008180–81, 008202–

15  03.  In February 2014, after lengthy public debate, the Fresno City Council certified the Final EIR

16  and approved the proposed project to reintroduce vehicular traffic to the Fulton Mall, finding the

17  specific economic, legal, social, technological, or other benefits of the project outweighed its

18  unavoidable adverse environmental effects.  AR 006108–21; *see also* AR 012029–70.

19        B.   NEPA Environmental Assessment

20              1.   Alternatives Considered

21        In February 2013, Caltrans made the preliminary determination that opening

22  Fulton Street to vehicular traffic could have adverse environmental effects, and formed the

23  preliminary conclusion that a "Complex Environmental Assessment" should be completed to

24  satisfy NEPA.[15]  AR 000023–32.  In October 2013, Caltrans and the City prepared a draft

25        [15] Under Caltrans' implementation of 23 U.S.C. § 327, EAs have been divided into two
26  categories: complex EAs and routine EAs.  *See* AR 000033, 005616.  Complex EAs are defined
    as those EAs that have complex issues or impacts in that they may include multiple location
27  alternatives, debate related to purpose and need, strong public controversy, issues related to
    logical termini or independent utility, individual Section 4(f) determinations, complex
28  Endangered Species Act issues, numerous cumulative impacts or high mitigation costs.

1   Complex EA that screened ten Build Alternatives and one No-Build Alternative for practicality

2   and feasibility.  AR 000088–110.  The ten Build Alternatives were derived from multiple sources,

3   including (1) a compilation of alternatives developed by the City; (2) concepts evaluated as part

4   of proposed planning documents; and (3) alternatives suggested by the public at scoping

5   meetings.  AR 005207.  The process of developing alternatives considered a range of engineering

6   and environmental constraints, particularly avoiding or minimizing use of features of Section 4(f)

7   properties.  AR 005410.

8          Alternative 1 consists of reopening the entire Fulton Mall to two-way streets, with

9   one lane of vehicular traffic in each direction alongside bicycle, pedestrian, and potentially other

10  travel modes.  AR 005198, 005362.  A total of 162 on-street vehicle parking spaces would be

11  added along the length of the Mall, along with twenty-eight new spaces along cross streets; mid-

12  block pedestrian crossings would be provided; and improvements would be made to the

13  streetscape.  AR 005198, 005362.  Pedestrian walkways would include a fourteen-foot sidewalk

14  on one side of the street and a twenty-eight-foot promenade on the other.  AR 005198, 005362.

15  Alternative 1 would utilize and incorporate all of the works of sculpture and mosaic benches

16  currently displayed on the Mall; reconstruct sixteen of the Mall's original twenty water features;[16]

17  and retain the total number of trees at approximately 154, after replanting 131 of the trees.

18  AR 005198.  The two existing "tot lots" (children's playgrounds) would be relocated and

19  combined into one larger "tot lot."  AR 005199, 005362.

20

21  _____

22  *See* AR 000033, 005616.  "Local termini" refers to rational end points for a transportation improvement, and rational end points for a review of the environmental impacts.  Memorandum, FHWA, *The Development of Logical Project Termini* (Nov. 5, 1993), https://www.environment.f

23  hwa.dot.gov/projdev/tdmtermini.asp.  "Independent utility" refers to a requirement under Section 4(f) that the transportation improvements have independent utility or significance, even if no

24  additional transportation improvements in the area are made.  *See id.*; *see also* 23 U.S.C.

25  § 771.111(f).

26      [16] The Final EA provides the following: "Seven of the existing twenty fountains are currently functioning.  Five would be rebuilt and remain in place.  Eleven others would be newly

27  built to resemble the originals and re-scaled and located in other locations along the Mall promenade."  AR 005198.

28

13

Alternative 2 consists of reconnecting the street grid similar to Alternative 1, but would include rebuilding distinctive elements of the Fulton Mall in five to six specific locations, identified as "vignettes." AR 005203. The vignettes are intended to preserve existing shade trees and features of the historic Eckbo design and would include many of the existing elements. *Id.* To best preserve existing elements, the street would have "gentle curves," rather than a straight curb line. *Id.* One lane of vehicular traffic would run in each direction and would curve through the vignettes. *Id.* Outside the vignette areas, the landscape would include an eight-foot-wide parallel parking lane and a pedestrian-only walking, seating, vegetation, and public art area that varies between fourteen- and forty-four-feet-wide on one side or both sides of the street. *Id.* Within the vignettes, there would be no parking lane, and the existing landscape elements would be kept intact as much as possible. *Id.* A total of fifty-two new on-street parking spaces would be introduced along the length of the Fulton Mall, and an additional thirty new spaces along cross streets. *Id.* Fourteen of the twenty existing sculptures would remain in their current location, and the other six would be relocated to the vignettes or other sidewalk areas. *Id.* Sixteen of the twenty fountains would be rebuilt to resemble the originals, and the total number of trees would decrease from 154 to ninety-seven. *Id.* As in Alternative 1, the two existing "tot lots" would be relocated and combined into one larger "tot lot." *Id.*

Alternatives 3 and 4 would restore and renovate the Mall's features and artwork without reopening the Mall to vehicular traffic. AR 000095–99, 005404–05. They include the option of adding an electric tram system along the length of the Mall. AR 000095–99, 005404–05. Alternatives 5 through 8 would each restore portions of the Mall and open up the rest to vehicular traffic. AR 000099–108, 005216. Alternatives 9 and 10 would introduce traffic on top of the existing Mall pavement. AR 000108–09, 005408. The No-Build Alternative would not re-open the Mall to vehicular traffic or make any improvements to the Mall. AR 000090, 005207, 005407.

After applying five criteria relating to financial feasibility, the ability to meet the purpose of the project, safety, and impacts to historic resources, the Draft EA identified Alternatives 1 and 2 as those that should move forward for further evaluation under NEPA.

1  AR 000088–110.  The Draft EA also carried forward an evaluation of the No-Build Alternative

2  because it is required under NEPA.  AR 00090.

3           2.        Selection of Preferred Alternative

4           On January 10, 2014, Caltrans made the Draft EA available for public and affected

5  agency comment.  AR 005333, 005541.  On February 25, 2014, a group of District 6[17] executive

6  managers, including the District Director and the Environmental Division Chief, met to consider

7  impacts to historic properties, Section 4(f) Least Overall Harm, purpose and need, and safety,

8  construction and operations of the project.  AR 005214.  The team also reviewed and considered

9  public input received on the Draft EA and Section 4(f) Analysis.  *Id.*; AR 005163–69.  Based on

10  the available data, the group selected Alternative 1 as the preferred alternative.

11  AR 005163, 005214.  Alternative 1 was determined to best meet the Section 4(f) Least Harm

12  criteria, to best meet the project's purpose and need, and to be the superior alternative from a

13  safety and operations standpoint.  AR 005215.  Specifically, the team found it significant that

14  Alternative 1, through its wide promenade, better preserves the feel of an urban park than

15  Alternative 2; preserves more of the aggregate pavement with river rock ribbons than Alternative

16  2; creates 190 new parking spaces, in comparison to the eighty-two parking spaces created by

17  Alternative 2; incorporates a straight curb line, which is safer than the curving curb line

18  incorporated by Alternative 2; and allows for maintaining 154 trees, in comparison to the ninety-

19  seven trees allowed by Alternative 2.  AR 005163.  In addition, Alternative 1 was favored by the

20  public over Alternative 2 in comments received on the Draft EA.  AR 005215.  As the Section

21  4(f) process and Section 106 consultation were still ongoing, Caltrans continued to consider new

22  information relating to the various alternatives prior to completing the Final EA.  AR 005214–15.

23  Because Caltrans did not receive any new material information, it issued a Final EA identifying

24  Alternative 1 as the preferred alternative on May 14, 2014.  *See* AR 005175–351.

---

25           [17] District 6 is one of Caltrans' twelve districts in California.  *See* Cal. Dep't of Transp.,
26  *District 6 Profile*, http://dot.ca.gov/dist6/.  It includes Madera, Fresno, Tulare, Kings and Kern
   counties, and is headquartered in Fresno.  *See id.*  The court takes judicial notice of these facts as
27  provided by Federal Rule of Evidence 201, because they "can be accurately and readily
   determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid.
28  201(b)(2).

3.     Finding of No Significant Impact (FONSI)

The Final EA determined an EIS was not required for the project, because Alternative 1 would have no significant impact on the human environment.  AR 005179.  The Final EA found there were no adverse impacts to growth, community character and cohesion, relocations and real property acquisition, utilities and emergency services, hydrology and floodplain, water quality and storm water runoff, paleontology, hazardous waste and materials, air quality, noise, climate change and greenhouse gas, or biological environment.  AR 005219–21.  The Final EA provided more detailed discussion of the impacts to land use, the community, traffic and transportation, visual/aesthetics, and cultural resources, as well as construction impacts and cumulative impacts, but ultimately concluded these impacts would not be "significant" within the meaning of NEPA.  AR 005222–328.  The impacts relevant to this action are the project's community impacts and impacts to traffic, pollution, and infrastructure.

a)     Community Impacts

All projects involving a federal action—funding, permit issuance, or land development—must comply with Executive Order 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations (Feb. 11, 1994), which directs federal agencies to take the appropriate and necessary steps to identify and address disproportionately high and adverse effects of federal projects on the health or environment of minority and low-income populations.  *See* AR 005243.  Title VI of the Civil Rights Act of 1964 prohibits discrimination based on race, color, and national origin in programs and activities receiving federal financial assistance.  *See* AR 005244.  To assess the impacts to the local economy and environmental justice, the Final EA relied on the 2011 Economic Impact Analysis, AR 014481–505, 2012 Fulton Mall Urban Decay Study, AR 014506–77, 2013 Technical Analysis Memorandum, AR 003479–85, and 2013 Community Impact Assessment, AR 003999–4068.  Caltrans found the project study area is in a state of urban decay due to economic disinvestment, with high vacancy rates, low lease rates, low retail sales, high crime rates, and deteriorating physical conditions.  AR 005241.  Caltrans concluded Alternatives 1 and 2 would influence business growth through the reoccupation of existing vacant buildings as vehicle access

16

1   and parking become available, which could result in a substantial benefit to the economy over an

2   unspecified period of time.  AR 005242–43.  Alternative 1 would potentially increase average

3   retail sales from $92 per square foot to $184 per square foot, reduce ground-floor vacancies from

4   26% to 9%, and provide approximately 2,100 new jobs.  *Id.*

5            For its analysis of environmental justice impacts, Caltrans defined the project

6   study area as three census blocks within Census Tract 1, encompassing Fulton Mall, Kern Mall,

7   Mariposa Mall, and Merced Mall.  AR 004011, 005244.  The project study area was established

8   based on land uses within structures adjacent to the malls and existing circulation.  AR 004011.

9   The original vision for the malls in the late 1950s was the establishment of a core superblock that

10  encompassed twelve city blocks with a ring road adjacent to the superblock.  *Id.*  The creation of

11  a car-free core superblock was not fully implemented because Tulare Street and Fresno Street

12  continued to provide access through the Mall area.  *Id.*  The boundaries of the original superblock

13  form the boundaries of the project study area.  *Id.*  This area contains primarily commercial

14  development, but also features three apartment complexes with about 466 residents.  AR 005244.

15  Most of the households in Tract 1 are single persons living below the poverty level.  *Id.*  The

16  population as of 2010 in Tract 1 is 73.4% white, but population and ethnic census data were not

17  available at the census block level for 2010.  AR 005245.  Most ground-floor retail businesses on

18  the Mall are minority owned, and many retail businesses are oriented toward Hispanic customers.

19  AR 005246.  Day users of the Mall include a mix of office workers and shoppers, and foot traffic

20  counts in 2010 found an average of 4,805 people passing through the Mall daily from 10:00 a.m.

21  to 6:00 p.m.  AR 005247.  "Hispanic/Latino" identity was claimed by 62% of survey respondents

22  passing daily through the Mall, and a smaller number of day users are homeless or

23  underemployed.  *Id.*  Based on a comparison of the census data for Tract 1 with the census data

24  for the other tracts in the downtown area, the technical analysis memorandum concluded "the

25  construction and operation of the Fulton Mall project would not result in an inequitable

26  environmental burden borne by low-income or minority populations."  AR 003482.  The

27  Community Impact Assessment likewise concluded Alternatives 1 and 2 would not cause

28

1    disproportionately high and adverse effects on any minority or low-income populations.  AR

2    004061.

3            Because the proposed project does not include demolition or reconstruction to any

4    of the buildings on the Mall, Caltrans found the project would not physically displace any

5    residents or businesses in the study area.  AR 005247–48.  In addition, Caltrans found residents

6    near the construction activities would not suffer any substantial impacts to air quality, noise,

7    traffic, or the local economy.  AR 005248–49.  Because current traffic volumes would simply be

8    redistributed onto the new narrow roadways from the existing neighboring roadways, long-term

9    air emissions and noise levels are not expected to substantially increase from current levels.

10   AR 005248.  Caltrans identified gentrification as a potential concern, but identified steps that

11   would be taken to help avoid gentrification, such as including affordable housing in future

12   development.[18]  AR 005247.  Caltrans found all businesses, including minority-owned

13   businesses, would benefit from the increased access and parking provided by the project.

14   AR 005248.  With respect to day users, the proposed project would reestablish and repair features

15   of the Mall that currently draw visitors, including benches, fountains, and artwork currently found

16   along the Mall.  AR 005249.  Caltrans found the addition of twenty-foot sidewalks would provide

17   a park-like setting for those who wish to linger, and additional parking spots could encourage

18   more people to visit the area.  *Id.*  For these reasons, Caltrans concluded the project would have

19   no significant community impacts.

20           b)      Impacts to Traffic, Pollution, and Infrastructure

21           The Final EA relied on various studies relating to traffic, pollution, and

22   infrastructure.  With respect to traffic, the Final EA relied on the findings of the 2013

23   ───────────────

24   [18] Plaintiffs do not specifically challenge Caltrans' consideration of gentrification, and it
     appears to have only been raised as a potential concern in one of the comments to the Draft EA
25   and Section 4(f) Analysis, *see* AR 005566 ("I hope best efforts are made to minimize
     'gentrification' + displacement of current businesses + homeless.  However, the current state of
26   the mall is not working . . . .  A relatively small change to one street in our city will help to bolster
     the well-being of every resident + will improve the City's brand + identity.  Open the mall ☺.").
27   Accordingly, the court's analysis focuses on plaintiffs' argument that the project may
     significantly impact low-income, minority day users' enjoyment of an urban park.

28

1    Transportation Impact Report, AR 003489–751.  The report analyzed eighteen study intersections

2    and sixteen roadway segments in the Mall area.  *See* AR 005249–50.  Future traffic conditions

3    were evaluated based on the assumption that land use plans currently anticipated by the City, such

4    as the FCSP, will be implemented.  *See* AR 005255.  Because the Fulton Mall Reconstruction

5    Project does not propose any new buildings or new residential or commercial development,

6    Caltrans concluded the project is not expected to affect traffic volumes, but is instead expected to

7    accommodate and redistribute existing traffic by providing access to existing and anticipated

8    businesses along the Mall.  AR 005255; *see* AR 003521.  In addition, Caltrans found the nominal

9    increase in average daily traffic with Alternative 1 would not significantly impact emissions.

10   AR 005255.  Construction of the High-Speed Rail station and the Bus Rapid Transit station,

11   anticipated in relatively near future, would reduce the use of automobiles in the project study

12   area, and development in urban centers has been shown to reduce the need for vehicle travel.  *Id.*

13          Because the alternatives would create narrow, two-way vehicular streets, Caltrans

14   found these new roadways would primarily carry local trips to access adjacent businesses and

15   would not affect traffic volumes outside the project area.  AR 005255–56; *see* AR 003521–22.

16   To evaluate the shift in traffic patterns, a locally validated version of the 2010 Fresno Council of

17   Governments Travel Demand Forecasting (COG TDF) model was used to estimate the re-

18   distribution of traffic in the study area.  AR 005256.  The COG TDF model confirmed opening

19   Fulton Mall to vehicular traffic would not affect traffic volumes outside the study area, and would

20   result in minor changes to local traffic patterns.  AR 003522, 005256.

21          With respect to air quality and greenhouse gas, the Final EA relied on the findings

22   of the 2013 Air Quality Analysis Report, AR 003835–996.  Caltrans found the proposed project

23   meets regional conformity, and the Environmental Protection Agency concurred that the project is

24   not a Project of Air Quality Concern on August 5, 2013.  AR 005220; *see also* AR 005507

25   ("FHWA concurs that this is not a project of air quality concern.").  According to the Air Quality

26   Analysis Report, the project would not generate significant quantities of criteria air pollutants or

27   ozone precursors, contains no meaningful potential for mobile source air toxics effects, and would

28   not generate localized CO impacts from project operation.  AR 003854–67; *see* AR 005220.  The

19

1   Air Quality Analysis Report also concluded the project would not generate an increase in

2   operational emissions of greenhouse gases and would not conflict with any applicable plan,

3   policy or regulation of an agency adopted for the purpose of reducing the emissions of

4   greenhouse gases.  AR 003850–51; *see* AR 005221.

5           As to public infrastructure, Caltrans found the project would not directly affect

6   existing or planned land uses in the project study area.  AR 005229.  Caltrans found the project

7   would result in an increase in the economic productivity of the Mall, but this indirect growth

8   would result in a beneficial impact on the future land uses within the project study area.  *Id.*; *see*

9   *also* AR 005242–43, 005248.  As discussed above, the Final EA's analysis of the impacts to the

10  local economy provided: "Alternatives 1 and 2 have the potential to influence business growth

11  through the reoccupation of existing vacant buildings as vehicle access and parking become

12  available, which on a regional (city) level could result in a substantial benefit to the economy by

13  providing a catalyst for additional development in the downtown area."  AR 005242.  In addition,

14  Caltrans found the cumulative impacts from growth were not substantial.  AR 005327–28.  The

15  City separately approved projects to replace storm drains, water lines, and sewer facilities

16  concurrently with the Fulton Mall Reconstruction Project.  AR 005225, 005619.

17          C.      Section 4(f) Evaluation

18                  1.      Impacts to Section 4(f) Properties

19          Caltrans published its Final Section 4(f) Evaluation together with its Final EA in

20  May 2014.  AR 005353–504.  Caltrans determined there are fourteen Section 4(f) properties

21  within the architectural Area of Potential Effects: the Fulton Mall Historic Landscape, the Fulton

22  Street/Fulton Mall Historic District, and twelve historic buildings.  AR 005368–75.  The Fulton

23  Mall Historic Landscape was found eligible for listing on the National Register of Historic Places

24  ("NRHP") for its importance as an urban park[19] and for its landscape architecture, with a period

25  of significance of 1964.  AR 005296.  The Fulton Mall Historic District was identified as a

26

27          [19] The Final EA notes that despite this finding, the Mall "is not legally designated as a
    park or intended by the City of Fresno for that use."  AR 005296.

28

1    commercial corridor along six blocks of the Fulton Mall.  AR 005297.  This District was found

2    eligible for listing for its association with early-to mid-20th century commercial development in

3    Downtown Fresno from 1914 to 1970.  *Id.*  The twelve historic buildings were listed or found

4    eligible for listing for their architectural features, with various periods of significance.  *See*

5    AR 005295–301.  Caltrans did not separately evaluate the Mall as a public park under Section

6    4(f), because the Mall is not publicly owned, is not intended by the City to function as a park, and

7    does not meet the Section 4(f) definition of a park.  *See* AR 005368; *see also* AR 001988–89;[20] *cf.*

8    AR 005239 ("No parks sit within the project study area.").

9        Caltrans considered the same ten Build Alternatives and one No-Build Alternative

10   for its Section 4(f) Evaluation as it considered for its NEPA EA.  Caltrans determined several of

11   the proposed project alternatives would result in the use of two of the Section 4(f) properties: the

12   Fulton Mall Historic Landscape and Fulton Street/Fulton Mall Historic District.  *See* AR 005368–

13   75, 005385.  Caltrans determined none of the alternatives would use the twelve individual historic

14   buildings, because the alternatives would implement measures to avoid impacts to the buildings

15   during construction.  AR 005385.

16   2.    Avoidance Alternatives

17       Because several of the alternatives require the use of Section 4(f) properties,

18   Caltrans considered whether any feasible and prudent avoidance alternatives exist under 49

19   U.S.C. § 303(c)(1).  Caltrans withdrew Alternatives 9 and 10 from consideration because they do

20   not comply with City design standards, and therefore are not "feasible" as defined by 23 C.F.R.

21   § 774.17.  AR 005408–09; *see* 23 C.F.R. § 774.17 ("(2) An alternative is not feasible if it cannot

22   be built as a matter of sound engineering judgment.").  Caltrans concluded Alternatives 3 and 4

23   and the No-Build Alternative would avoid use of the Section 4(f) historic sites but are

24   "imprudent" under criterion (i) of § 774.17[21]—"[the alternative] compromise[] the project to a

25
26   ────────────────────
     [20] Certain documents in the administrative record appear to be assigned duplicate page
     numbers.  As cited throughout this order, AR 001988–89 refers to the statement "The City Has
     Not Designated the Fulton Mall as a City Park" in Volume 7 of the record.
27
     [21] The full text of § 774.17 is provided *supra*, in Section III.B.
28

1  degree that it is unreasonable to proceed with the project in light of its stated purpose and need."

2  *See* AR 005403–10.  Specifically, Caltrans found these alternatives would not increase the

3  mobility and accessibility in the project study area, would not increase the visibility of business

4  storefronts to drivers, would not reopen the downtown street grid in coordination with proposed

5  local planning documents, and would not be eligible for TIGER grant funding or other currently

6  available funding sources.  AR 005406–08.  As a result, Caltrans concluded there are no feasible

7  and prudent alternatives to using the Section 4(f) properties under 49 U.S.C. § 303(c)(1).

8                           3.      Least Overall Harm and Mitigation Measures

9           Caltrans next considered the factors listed under 23 C.F.R. § 774.3(c)(1)[22] and

10  determined Alternative 1 would cause the least overall harm to the Section 4(f) properties.

11  AR 005439.  Although Caltrans found Alternative 5 would best minimize the impacts to the

12  Section 4(f) properties, Caltrans rejected that alternative because it fails to meet the purpose and

13  need of the project, as described below.  *Id.*  Caltrans concluded Alternative 1 best meets the

14  purpose and need of the project and causes slightly less harm than Alternative 2 after mitigation.

15  *Id.*

16                           a)      Purpose and Need

17           Caltrans found Alternative 1 would provide the best mobility and access in the

18  study area, because it would create significantly more parking than any other alternative and has a

19  straight curb line.  AR 005431–33.  Alternative 1 would also best increase visibility to businesses,

20  traffic circulation, and economic development.  AR 005433–36.  Improvements in these areas

21  would be limited under Alternatives 5 through 8, because they retain pedestrian-only access for

22  portions of the Mall.  AR 005436.  For example, it is estimated Alternative 5 would increase

23  gross sales revenues by only 21%, in comparison to the 47% increase estimated under Alternative

24  1.  *Id.*  Caltrans found that this factor alone would compromise Alternatives 5 through 8 to a point

25  where it would be unreasonable to expect the City to proceed with the project.  *Id.*  Finally,

26

27  _____

28           [22] The full text of § 774.3(c)(1) also is provided *supra*, in Section III.B.

1   Caltrans found Alternative 1 would be equivalent or slightly superior to Alternative 2 and

2   superior to other alternatives in consistency with local land use plans.  AR 005437–38.

3               b)      Harm to Section 4(f) Properties

4               Every alternative would result in the destruction of the Mall as an historic property

5   by the change in historic use from pedestrian to mixed modes of transportation.  AR 005424,

6   005427.  Although Alternative 2 would retain a slightly greater number of historic features in

7   their present locations, Alternative 1's incorporation of the wide promenade and straight street

8   would be more consistent with Eckbo's original design intent and the Mall's historic function.[23]

9   AR 005425, 005427–28.  Alternative 1's promenade would allow for prominent display for

10  artwork and other character-defining features of the current Mall, as well as a wide area with

11  benches and areas for groups to congregate.  AR 005425–27.  Alternative 1 also retains a greater

12  percentage of the original stained concrete with river rock aggregate and results in fifty-seven

13  more trees than Alternative 2.  AR 005427.

14              For these reasons, Caltrans concluded Alternative 1 causes the least overall harm

15  under 23 C.F.R. § 774.3(c)(1).

16              c)      Mitigation Measures

17              To comply with 23 C.F.R. § 774.3(c)(2), Caltrans developed a number of measures

18  for Alternative 1 to minimize harm to the Section 4(f) properties.  For example, Caltrans

19  determined it would be preferable to offset the center of the street and provide a wider promenade

20  on one side of the street to preserve the greatest number of original landscape features and

21  maintain the urban park atmosphere of the Mall.  AR 005411.  In addition, through the Section

22  106 consultation process, Caltrans executed a Memorandum of Agreement with the State Historic

23  Preservation Officer and the Advisory Council on Historic Preservation in May 2014 regarding

24  measures to mitigate harm to historic resources.  See AR 005412–16, 005521–33.  Caltrans found

25

26              [23] Specifically, the evaluation reasoned that Alternative 2's design would create a
    somewhat disconnected pattern not consistent with earlier period of significance for the Historic
27  District, and that Alternative 2's curving road would make placement of vendor booths and
    exhibits more difficult, thereby making it more difficult to continue the Mall's historic function of
28  hosting special events.  See AR 005425, 005427–28.

the agreed upon mitigation measures would resolve the anticipated adverse effects of the project and would satisfy the requirement under 23 C.F.R. § 774.3(c)(2) that the alternative selected include "all possible planning" to minimize harm.  AR 005412; *see also* AR 005522.

In June 2014, after Caltrans completed the NEPA and Section 4(f) processes, FHWA executed a contract committing itself to funding the proposed project.  AR 000273–83.

## V.     LEGAL STANDARD

### A.     Summary Judgment Under the APA

A court must grant summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure when the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). After giving notice and a reasonable time to respond, the court may also grant summary judgment to a nonmoving party under Rule 56(f)(1).  Fed. R. Civ. P. 56(f)(1); *Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 311 (9th Cir. 1982).

A court considering a challenge to agency action under the APA "sits as an appellate tribunal," *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001), and the "complaint, properly read, actually presents no factual allegations, but rather only arguments about the legal conclusion[s] to be drawn about the agency action," *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).  Because the APA requires the court to review the whole record or those parts of it cited by a party, the court does not determine whether there are disputed issues of material fact, as it would in a typical summary judgment proceeding. *Occidental Eng'g Co. v. Immigration & Naturalization Serv.*, 753 F.2d 766, 769 (9th Cir. 1985); *see also S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 723 F. Supp. 2d 1247, 1256 (E.D. Cal. 2010) (stating usual summary judgment standards do not apply).  Rather, the reviewing court's function "is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Occidental Eng'g*, 753 F.2d at 769; *see also Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) ("Because this is a record review case, we may direct that summary judgment be granted to either party based upon our review of the administrative record.").

24

1         B.     Standard of Review

2         A reviewing court can only set aside an agency's decision not to prepare an EIS

3 upon a showing that the decision was "arbitrary, capricious, an abuse of discretion, or otherwise

4 not in accordance with law." 5 U.S.C. § 706(2)(A); *Dep't of Transp. v. Pub. Citizen*, 541 U.S. at

5 763; *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 376–77 (1989); *Kleppe v. Sierra Club*,

6 427 U.S. 390, 412 (1976). Likewise, agency action under Section 4(f) is reviewed under the

7 arbitrary and capricious standard. 5 U.S.C. § 706(2)(A); *Citizens to Pres. Overton Park, Inc. v.*

8 *Volpe*, 401 U.S. 402, 414 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S.

9 99, 105 (1977); *Stop H-3 Ass'n v. Dole*, 740 F.2d 1442, 1449 (9th Cir. 1984). To determine

10 whether agency action was arbitrary or capricious, "the court must consider whether the decision

11 was based on a consideration of the relevant factors and whether there has been a clear error of

12 judgment." *Volpe*, 401 U.S. at 416; *see also Westlands Water Dist. v. U.S. Dep't of Interior*, 376

13 F.3d 853, 865 (9th Cir. 2004) (quoting *Marsh*, 490 U.S. at 378).

14         "Review under the arbitrary and capricious standard is narrow, and we do not

15 substitute our judgment for that of the agency." *Cascadia Wildlands v. Bureau of Indian Affairs*,

16 801 F.3d 1105, 1110 (9th Cir. 2015) (quoting *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 656 (9th

17 Cir. 2009)); *see also Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006)

18 ("The arbitrary and capricious standard is 'highly deferential, presuming the agency action to be

19 valid . . . .'" (citation omitted)). Rather, the court will reverse a decision only if

20
21
22
        the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

23 *Cascadia*, 801 F.3d at 1110 (quoting *Castaneda*, 574 F.3d at 656); *see Motor Vehicle Mfrs. Ass'n*

24 *of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (applying the standard to agency

25 rule making).

26

27

28

1    VI.    DISCUSSION

2          A.    Environmental Impact Statement Under NEPA

3                As stated above, an agency must prepare an EIS if a project may significantly

4    affect the quality of the human environment.  42 U.S.C. § 4332(2)(C); *see Babbitt*, 241 F.3d at

5    736.  To determine whether the impacts of a proposed project will be "significant," an agency

6    must evaluate the "context" and "intensity" of the environmental effects.  40 C.F.R. § 1508.27.

7    Context relates to the scope of the agency's action, including the locale and interests affected, and

8    intensity relates to the severity of the impact.  *Id.*; *Babbitt*, 241 F.3d at 731.  In evaluating

9    intensity, an agency should consider, *inter alia*, "[t]he degree to which the effects on the quality

10   of the human environment are likely to be highly controversial."  40 C.F.R. § 1508.27(b)(4).  The

11   effects of a project on the environment are not "controversial" within the meaning of

12   § 1508.27(b)(4) simply because opposition exists to the project.  *Found. for N. Am. Wild Sheep v.*

13   *U.S. Dep't of Agr.*, 681 F.2d 1172, 1182 (9th Cir. 1982).  Rather, the effects are "controversial"

14   when "substantial questions are raised as to whether a project . . . may cause significant

15   degradation of some human environmental factor," *Babbitt*, 241 F.3d at 736, or when "a

16   substantial dispute exists as to the size, nature, or effect of the major federal action," *Wild Sheep*,

17   681 F.2d at 1182 (citation omitted).  For example, in *Sierra Club v. U.S. Forest Service*, 843 F.2d

18   1190 (9th Cir. 1988), the Forest Service awarded several timber contracts that contained groves of

19   giant sequoia redwoods without preparing an EIS.  *Id.* at 1191–92.  The plaintiffs produced

20   evidence from numerous experts who were highly critical of the EAs and disputed the Forest

21   Service's conclusion that there would be no significant effects of logging because the sequoias

22   could be protected and their regeneration enhanced.  *Id.* at 1193–94.  The court observed that

23   "[t]his is precisely the type of 'controversial' action for which an EIS must be prepared."  *Id.* at

24   1193.

25                In evaluating intensity, an agency should also consider "[t]he degree to which the

26   possible effects on the human environment are highly uncertain or involve unique or unknown

27   risks."  40 C.F.R. § 1508.27(b)(5).  For example, in *Babbitt,* the National Park Service began

28   implementing a plan to increase the number of cruise ship visits to Glacier Bay National Park.

1    241 F.3d at 725.  The Park Service issued a finding of no significant impact, even though the EA

2    concluded that the intensity or practical consequences of the environmental effects was

3    "unknown."  *Id.* at 732–35.  Although the EA proposed a park research and monitoring program

4    to "understand the effects of vessel traffic on air quality, marine mammals [and] birds," *id.* at 733

5    (alteration in *Babbitt*), the court found "[t]hat is precisely the information and understanding that

6    is required *before* a decision that may have a significant adverse impact on the environment is

7    made, and precisely why an EIS must be prepared in this case," *id.* (emphasis in original).

8    Similarly, in *Anderson v. Evans*, 371 F.3d 475 (9th Cir. 2002), the federal government approved a

9    quota for whale hunting by Makah Indian Tribe.  The Ninth Circuit found the uncertainty of the

10   effects required the preparation of an EIS, because "[n]o one, including the government's retained

11   scientists, ha[d] a firm idea what [would] happen to the local whale population if the Tribe [were]

12   allowed to hunt and kill whales pursuant to the approved quota and Makah Management Plan."

13   *Id.* at 490.  Specifically, it was difficult to predict how the harvesting of resident whales could

14   affect the resident population, because the recruitment mechanism of the resident whales was not

15   known and required further study.  *Id.* at 490–91.

16          Plaintiffs contend Caltrans violated NEPA because its environmental assessment

17   raised substantial questions as to whether the project may have significant effects on low income,

18   minority communities, or on traffic, air quality, greenhouse gas, and public infrastructure.  Pls.'

19   Mot. Summ. J. at 5–10.  The court addresses each argument in turn.

20                    1.    Community Impacts

21          Plaintiffs argue the EA's analysis and the studies on which it relies are defective

22   because they limit the project study area to three census blocks within Census Tract 1 and do not

23   adequately consider the impact on low-income, minority day users who enjoy the Mall as an

24   urban park.  Pls.' Reply at 5–6.

25          First, the court finds Caltrans' definition of the project study area was not

26   unreasonable.  The Community Impact Assessment provided a rational basis for its definition of

27   the project study area: the boundaries were established based on "land uses within structures

28   adjacent to the malls" and existing circulation, and extend to the boundaries of the core

superblock that was envisioned in the late 1950s.  AR 004011.  Moreover, it is a matter of

common sense that residents and businesses in the immediate project area would be most

impacted by the air quality, noise, traffic, relocation, and economic effects of a project to

reintroduce vehicular traffic to particular streets.  *See* AR 005247–49.  There is no evidence of

arbitrary line-drawing with the goal of excluding an area that would have undermined the

analysis.  Furthermore, although the defined project study area only consists of three census

blocks, the Final EA considered the demographics of and impacts to day users of the Mall,

regardless of where they reside.  *See* AR 005247 (demographics of day users), 005249 (impacts to

day users); *cf.* AR 004059–61 ("Following is a discussion of potential impacts to the residences

within the Project Study Area and the Mall 'day' users.").  The Final EA considered all of the

affected interests—those of residents and businesses in the project study area and day users—and

provided a thorough analysis of potential social, economic, and land use impacts on each group.

Second, the court finds Caltrans considered the relevant factors and articulated a

rational basis for its conclusion that the project would not significantly impact day users.

Although the Final EA did not label the Mall an "urban park," it considered the potential impact

to day users' enjoyment of the park-like setting of the Mall.  *See* AR 005249.  The Final EA

concluded the impact would be minimal, because the project includes measures to preserve the

park-like setting of the Mall, and the increased parking and access would benefit day users.  *See*

*id.*; *cf.* AR 005190 (finding that people tend to prefer to reach their destinations quickly to take

care of shopping or business needs, especially if they have young children or are elderly and/or

disabled).  The court finds this conclusion reasonable given the evidence in the record.  After the

project is completed, features of the Mall that currently draw visitors will be reestablished,

including access to benches, fountains, and artwork currently found along the Mall.  AR 005249.

All of the sculptures and benches and most of the fountains will be relocated, refurbished, and/or

restored, and Alternative 1 will retain the total number of trees at approximately 154.  *See*

AR 005198.  In addition, the twenty-eight-foot-wide promenade will provide a park-like setting

where pedestrians can walk, sit, and gather.  *See* AR 005249.

1    In contrast to *Sierra Club*, 843 F.2d at 1192–93, plaintiffs have not produced

2  affidavits from experts identifying the EA's inadequacies or evidence casting doubt on the

3  reasonableness of Caltrans' conclusion that the project would not significantly impact day users.

4  *Cf. Babbitt*, 241 F.3d at 736 ("A substantial dispute exists when evidence, raised prior to the

5  preparation of an EIS or FONSI, casts serious doubt upon the reasonableness of an agency's

6  conclusions." (internal citations omitted)).   And unlike in *Babbitt* or *Anderson*, plaintiffs have not

7  shown that the effects of the project on the community are highly uncertain or involve unknown

8  risks requiring further study.  *See Babbitt*, 241 F.3d at 732–35; *Anderson*, 371 F.3d at 490–91.

9  Plaintiffs' mere characterization of the project as "demolishing" an "urban park" does not suffice

10 to raise "serious questions" as to whether the project may cause significant degradation of some

11 human environmental factor.  *See Babbitt*, 241 F.3d at 736.  Because Caltrans considered the

12 relevant factors and did not make a clear error of judgment in light of the record before it, the

13 court finds Caltrans' decision was not arbitrary or capricious.  *See Volpe*, 401 U.S. at 416.

14                    2.    Impacts to Traffic, Pollution, and Public Infrastructure

15    Plaintiffs argue there are substantial questions as to whether the project will

16 significantly impact traffic, air quality, greenhouse gas effects, and public infrastructure,

17 "[a]ssuming the Project is intended to maximize growth and development in the City's urban

18 core."  Pls.' Mot. Summ. J. at 8; *see also* Pls.' Reply at 7.  For purposes of environmental

19 assessment under NEPA, "effects" include both "direct effects" and "indirect effects."  40 C.F.R.

20 § 1508.8.  "Indirect effects may include growth inducing effects and other effects related to

21 induced changes in the pattern of land use, population density or growth rate, and related effects

22 on air and water and other natural systems, including ecosystems."  *Id.* § 1508.8(b).  Defendants

23 respond that the purpose of the project is not to maximize growth, and that any "growth"

24 anticipated from the project is economic, not physical.  City's Mot. Summ. J. at 13; Caltrans'

25 Mot. Summ. J. at 8.  Moreover, defendants contend Caltrans' conclusions are supported by

26 various studies prepared for the project.  *See, e.g.*, City's Mot. Summ. J. at 13–14.

27    The court finds plaintiffs have not raised substantial questions as to whether the

28 growth resulting from the project will cause significant environmental impacts.  The court

29

recognizes the apparent tension in Caltrans' position that the project will significantly increase retail sales and lead to the repopulation of vacant commercial spaces, yet will not increase the volume of traffic or otherwise lead to significant growth-inducing environmental effects. *See, e.g.*, AR 005436 (Alternative 1 would increase gross sales revenues by $47 million (47%)). However, because Caltrans considered the relevant factors, noted that transit will serve the redeveloped mall and offset vehicle traffic, and provided support for its finding of no significant impact, the court finds plaintiffs have not met their burden of showing that Caltrans' actions were arbitrary or capricious. The court notes that the stated purpose of the project is to increase access and visibility in the area and to increase the area's consistency with proposed land use plans, rather than to maximize growth in the downtown area. *See* AR 005189–90. Moreover, Caltrans articulated a rational explanation for its conclusions that the project will not significantly increase traffic volumes and will not affect traffic beyond the immediate area: the project does not propose any traffic-generating land uses, such as new buildings or residential development, and will create narrow, two-way vehicular streets that primarily carry local trips to businesses adjacent to the Mall. *See* AR 005255 (concluding the project would primarily shift local traffic patterns from existing streets to the reintroduced roadways adjacent to the Mall); *see also* AR 003521. Finally, Caltrans supported its finding of no significant impact with evidence from various studies. For example, the Transportation Impact Report upon which Caltrans relied utilized a COG TDF model to confirm the project would not significantly affect traffic volumes, AR 005256, and accounted for existing and future land uses in its analysis, *see, e.g.*, AR 005255 (evaluating future traffic conditions based on the assumption that land use plans currently anticipated by the City, such as the FCSP, will occur). In light of the support in the record, the court does not find Caltrans' conclusion unreasonable on its face.

In making this determination, the court has reviewed precedent for guidance. While there is a dearth of cases directly analogous, one Ninth Circuit decision the court has considered is *Barnes v. U.S. Department of Transportation*, 655 F.3d 1124 (9th Cir. 2011). While *Barnes* addresses the particular circumstances posed by airport development projects, in that case the Circuit held the EA failed to take a "hard look" at whether a new runway would have

growth-inducing effects on aviation activity.  *Id.* at 1136–39.  In *Barnes*, the agencies did not

conduct a demand forecast based on three, rather than two runways, and could not point to any

documents in the record that actually discussed the impact of a third runway on aviation demand.

*Id.* at 1136, 1138.  In addition, the Federal Aviation Administration had described a new runway

as "the most effective capacity-enhancing feature an airfield can provide," and other courts had

noted the unique potential of a new runway to spur demand.  *Id.* at 1138.  Here, in contrast, the

EA considered the potential traffic-generating effects of the project and accounted for expected

future land uses in its modeling.  In addition, there is no evidence suggesting the addition of a

narrow two-lane street in the downtown area here would necessarily have the same kind of

growth-generating effects as, for example, the addition of a runway at an airport that has only two

runways.

With respect to air quality, the proposed project meets regional conformity, and

the Environmental Protection Agency concurred that the project is not a Project of Air Quality

Concern.  *See* AR 005220.  As to infrastructure, the City has approved projects to replace storm

drains, water lines, and sewer facilities concurrently with the project.  *See* AR 005225, 005619.

Throughout the Final EA, Caltrans properly considered the relevant factors and the potential

impacts of indirect growth on the environment.  Again, plaintiffs have not identified any evidence

casting doubt on the reasonableness of Caltrans' finding of no significant impact.

### 3.  Conclusion

In making its finding of no significant impact, Caltrans considered the relevant

factors and articulated a rational basis, supported by evidence, for its conclusion.  As stated

above, the Supreme Court has made clear that "NEPA itself does not mandate particular results,

but simply prescribes the necessary process."  *Robertson*, 490 U.S. at 350.  Because Caltrans took

a "hard look" at the potential environmental impacts of the project and has not made a clear error

of judgment, the court concludes Caltrans' actions under NEPA were not arbitrary or capricious.

### B.  Section 4(f) Evaluation

Plaintiffs argue Caltrans violated Section 4(f) for three reasons: it did not analyze

Fulton Mall as a "public park"; it unreasonably rejected Alternatives 3 and 4 and a proposed alley

1  alternative in its avoidance alternative analysis; and it unreasonably rejected Alternatives 5

2  through 8 in its least overall harm analysis.  Pls.' Mot. Summ. J. at 10–18.  The court addresses

3  each argument in turn.

4                           1.         Whether Fulton Mall is a "Public Park"

5         Section 4(f) only applies to the use of public parks, recreation areas, wildlife and

6  waterfowl refuges, and historic sites.  49 U.S.C. § 303(a).  The parties agree that the Mall and

7  Fulton Mall Historic District are "historic sites" under Section 4(f) but dispute whether Caltrans

8  was also required to analyze the use of the Mall as a "public park."  The parties specifically

9  dispute whether the primary purpose of the Fulton Mall is to provide an urban park setting or to

10  provide a pleasant retail environment to attract shoppers traveling through the Mall.  *Compare*

11  City's Mot. Summ. J. at 18–20, *with* Pls.' Reply at 9.  The parties also dispute the significance of

12  the facts that the land making up the Mall is owned in fee simple by the owners of the buildings

13  adjacent to the Mall, and that the City holds only a right-of-way easement across the length of the

14  Mall.  *Compare*  City's Mot. Summ. J. at 15, *with* Pls.' Reply at 12.

15         Although the statute does not provide a definition for "public parks," the FHWA's

16  Section 4(f) Policy Paper provides that publicly owned land is a park "when the land has been

17  officially designated as such by a Federal, State or local agency, and the officials with jurisdiction

18  over the land determine that its primary purpose is as a park."  City's Ex. A, at 23, ECF No.

19  40-2.[24]  "Primary purpose is related to a property's primary function and how it is intended to be

20  managed.  Incidental, secondary, occasional or dispersed activities similar to park . . . activities do

21  not constitute a primary purpose within the context of Section 4(f)."  *Id.*  An easement interest in

22  privately-owned land may be adequate for Section 4(f) to apply, especially when the easement is

---

[24] Plaintiffs and the City each request judicial notice of excerpts of FHWA's Section 4(f) Policy Paper at FHWA's website: www.environment.fhwa.dot.gov/4f/4fpolicy.asp#ppra.  *See* ECF No. 36; ECF No. 40-2.  A court may take judicial notice of government agency records and reports.  *See Interstate Nat'l Gas Co. v. S. Cal. Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1953); *see also U.S. ex rel. Modglin v. DJO Global Inc.*, 48 F. Supp. 3d 1362, 1381 (C.D. Cal. 2014).  Because the existence of the Policy Paper "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," the court takes judicial notice of the excerpts provided under Federal Rule of Evidence 201(b)(2).

1   a conservation or historic preservation easement.  *See id.* at 24.  FHWA's Section 4(f) Policy

2   Paper directs courts to consider the views of the official(s) with jurisdiction, purpose of the

3   easement, term of the easement, degree of public access to the property, how the property is to be

4   managed and by whom, what parties obtained the easement, termination clauses, and what

5   restrictions the easement places on the property owner's use of the easement area.  *Id.*

6          Plaintiffs have not met their burden of establishing that Caltrans violated Section

7   4(f) by not analyzing the Mall as a "public park."  First, plaintiffs have not shown the primary

8   purpose of the land is as a park.  The City Council's ordinance approving creation of the Fulton

9   Mall in 1964 referred to it as a "pedestrian mall," and established the Mall under the California

10  Pedestrian Mall Law of 1960, Cal. Sts. & High. Code §§ 11000 *et seq.*  AR 000344–48.  Section

11  11006 of the Pedestrian Mall Law defines "pedestrian mall" as "one or more 'city streets,' or

12  portions thereof, on which vehicular traffic is or is to be restricted in whole or in part and which is

13  or is to be used exclusively or primarily for pedestrian travel."  Cal. Sts. & High. Code § 11006.

14  The historical context of the Mall suggests its purpose was to "modernize" the downtown

15  shopping district and compete with the newly created suburban malls, rather than to create park

16  space.  AR 001840, 001988–89, 004891.

17         Plaintiffs rely on *Stewart Park & Reserve Coalition, Inc. (SPARC) v. Slater*, 352

18  F.3d 545 (2d Cir. 2003), but the property at issue in that case was "heavily used for hunting,

19  fishing, hiking, biking, birdwatching, horseback riding, and numerous other outdoor pursuits" for

20  almost thirty years prior to the proposed project to construct an interchange connecting an

21  interstate highway to an airport.  *Id.* at 550.  In this case, the Mall was first established as a

22  pedestrian mall and has not been used for most of the activities at issue in *Stewart Park*.

23  Plaintiffs' also rely on *HonoluluTraffic.com v. Federal Transit Administration*, No. 11-00307,

24  2012 WL 5386595 (D. Haw. Nov. 1, 2012), *aff'd*, 742 F.3d 1222 (9th Cir. 2014), in their reply

25  brief, but overstate the holding of that case.  *See* Pls.' Reply at 10.  In *HonoluluTraffic.com*, the

26  district court evaluated an urban park that was "primarily used by pedestrians walking through the

27  area" as both a public park and as an historic site under Section 4(f).  *Id.* at *10.  However, the

28  issue adjudicated in that case was whether the proposed fixed guideway transit project

constructively "used" the park within the meaning of Section 4(f), rather than whether the land constituted a "public park."  *Id.*  It is not clear from the opinion whether the parties disputed the characterization of the land as a public park, and the opinion does not provide many factual details relating to its eligibility as a park.  *See id.*  Accordingly, it is difficult to determine exactly why the urban park in that case was found eligible as a public park under Section 4(f).

Second, the record does not contain a copy of the easement or any evidence showing the easement's purpose was to allow use of the land as a park.  The limited evidence available suggests the adjacent businesses that own the land in fee simple granted the City a right-of-way easement to allow travel across the land.  *See* AR 005185, 013960.

Finally, plaintiffs have not provided evidence that the City of Fresno designated the Mall as a "park."  Neither the 2025 General Plan nor the Central Area Community Plan refers to the Mall as a "park," and the Fresno Municipal Code regulates the Mall as a type of street, rather than as a park.  AR 001988.  Although the City maintains the Mall landscape through the Department of Parks, Public Utilities, and Public Works, *see* AR 005222, the management of that department is not limited to parks, and other City departments also help operate the Mall, such as Community Sanitation and Facilities.  *See* AR 001988.  Individuals seeking to conduct special events on the Mall must obtain an encroachment permit from the City's Public Works Department, not a Special Activity Permit issued for special events conducted in city parks.  *See id.*  Although plaintiffs note that the Keeper of the National Register of Historic Places found the Mall to be "an important urban park," AR 010026–30, the Keeper's determination is only legally relevant as to whether the Mall is an historic resource, *see* 23 C.F.R. § 774.17 (defining "historic site" as "includ[ing] any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register").

Because plaintiffs have not established the City designated the land as a park, or the primary purpose of the Mall is as a park, plaintiffs have not shown Caltrans' decision was arbitrary or capricious.

34

1                     2.      Avoidance Alternatives

2             Plaintiffs argue that Caltrans' rejection of Alternatives 3 and 4 was unreasonable,

3     because these alternatives meet the project's purpose of increasing mobility, accessibility, and

4     visibility without using the Section 4(f) historic sites.  Specifically, plaintiffs assert Alternatives 3

5     and 4 would increase mobility and accessibility in the Mall by improving the condition of the

6     Mall and adding an electric tram, and would improve visibility of the Mall through additional

7     lighting and signage.  Pls.' Mot. Summ. J. at 14.

8             The court does not find Caltrans' rejection of Alternatives 3 and 4 was arbitrary or

9     capricious.  The Ninth Circuit has held that "[a]lternatives that do not accomplish the purposes of

10    the project may properly be rejected as imprudent." *Ariz. Past & Future Found., Inc. v. Lewis*,

11    722 F.2d 1423, 1428 (9th Cir. 1983); *Alaska Ctr. for Env't v. Armbrister*, 131 F.3d 1285, 1288

12    (9th Cir. 1997).  Here, the stated purpose of the proposed project is to increase mobility and

13    access in the Fulton Mall study area by providing more convenient multi-modal access options on

14    the Mall and its cross streets; to improve visibility of businesses and other amenities by

15    improving traffic circulation, thereby encouraging additional economic development in the area;

16    and to increase the Fulton Mall study area's consistency with the requirements and goals of

17    proposed land use plans.  AR 005189–90, 005360.  The Section 4(f) Evaluation correctly

18    evaluated the alternatives under the criteria listed in 23 C.F.R. § 774.17 and provided specific

19    reasons why Alternatives 3 and 4 would compromise the project to a degree making it

20    unreasonable to proceed with the project in light of its stated purpose and need.  AR 005406–07;

21    *see* 23 C.F.R. § 774.17 (criterion (i)).  Although one of the reasons provided was that Alternatives

22    3 and 4 would not be eligible for TIGER grant funding, AR 005406–07, the evaluation provided a

23    number of additional reasons why these alternatives are imprudent.  *Id.*  For example, because

24    these alternatives would not reintroduce any vehicular traffic to the Mall, the evaluation found

25    they would not increase the visibility of business storefronts to drivers, improve multi-modal

26    access to businesses, or add any on-street parking.  *See* AR 005405–06.  In addition, the

27    evaluation found these options have the least potential for reversing urban decay.  *See id.*

28    Whereas reconnection of the street grid, as in Alternatives 1 and 2, would improve annual retail

1    sales by $47 million, and reconnecting portions of the street grid, as in Alternatives 5 through 8,

2    would improve annual sales by $27 million, Alternatives 3 and 4 would only improve retail sales

3    by $6.1 million.  AR 005406.  Accordingly, this case is distinguishable from *Coalition for*

4    *Responsible Regional Development v. Brinegar*, 518 F.2d 522, 526 (4th Cir. 1975), in which the

5    Fourth Circuit held a project site could not be rejected as an avoidance alternative solely due to

6    the inability to use certain funding sources to finance the option.  *Id.* at 526; *see also Defs. of*

7    *Wildlife v. N. Carolina Dep't of Transp.*, 762 F.3d 374, 400 (4th Cir. 2014) ("[A] state may not

8    use 'self-imposed restrictions' on financing mechanisms to render an alternative imprudent."

9    (quoting *Brinegar*, 518 F.2d at 526)).  There is ample support in the record for the conclusions

10   that Alternatives 3 and 4 would not accomplish the stated purpose and need of the project,

11   independent of the availability of TIGER funds, and plaintiffs have not provided evidence that

12   this determination was arbitrary or capricious.

13            Plaintiffs next contend the stated purpose and need of the project is "unreasonably

14   narrow" and was inappropriately developed and adopted from the TIGER grant application in

15   order to foreclose consideration of alternatives.  Pls.' Mot. Summ. J. at 15–16; Pls.' Reply at 13–

16   14.  Agencies enjoy "considerable discretion" to define the purpose and need of a project.

17   *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1066 (9th Cir. 1998).  However, "an

18   agency cannot define its objectives in unreasonably narrow terms."  *City of Carmel–By–The–Sea*

19   *v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997).  "An agency may not define the

20   objectives of its action in terms so unreasonably narrow that only one alternative from among the

21   environmentally benign ones in the agency's power would accomplish the goals of the agency's

22   action, and the EIS would become a foreordained formality."  *Friends*, 153 F.3d at 1066 (citation

23   omitted) (evaluating agency action under NEPA).  For example, in *Davis v. Mineta*, 302 F.3d

24   1104 (10th Cir. 2002), the Tenth Circuit found it would be too narrow to express the purpose and

25   need of a project as providing a river crossing across the Jordan River at the 11400 South corridor

26   in Utah, when the general overarching objective of the project was to improve traffic flow in the

27   area.  *Id.* at 1119.  The court found alternatives of providing a river crossing at different

28   intersections would potentially accomplish the overarching objective of the project.  *Id.*

1    Here, the stated purpose and need was not unreasonably narrow or contrived to

2  avoid consideration of alternatives under Section 4(f).  The record provides support for Caltrans'

3  identification of the need to improve access and visibility in the Mall to reverse urban decay.

4  Moreover, the City and Caltrans considered public input in developing the alternatives.  *See*

5  AR 005207.  Contrary to plaintiffs' contention, Caltrans did not draw on the terms of the TIGER

6  grant to preordain the selection of Alternative 1.  Although the City applied for the TIGER grant

7  in June 2013 and received it in August 2013, Caltrans continued to consider ten Build

8  Alternatives and one No-Build Alternative throughout the NEPA and Section 4(f) processes,

9  which concluded in May 2014.  The FHWA did not commit itself to funding the project until

10  June 2014, after the NEPA and Section 4(f) processes were completed.  *See* AR 000273–83.  The

11  Section 4(f) Evaluation provided an especially rigorous comparison of both Alternative 1 and

12  Alternative 2, signalling an openness to either.

13    Finally, plaintiffs argue that Caltrans violated Section 4(f) by failing to consider an

14  alternative that would convert the alleys adjoining the Mall into an alternative route for

15  vehicular traffic, rather than reintroducing vehicular traffic to Fulton Street.  *See* Pls.' Mot.

16  Summ. J. at 16–17.  The Ninth Circuit has held that "the existence of an unexamined but viable

17  alternative to the adopted plan can . . . provide a basis for overturning" the decision that a Section

18  4(f) property be used, if the alternative was "reasonable."  *Coal. for Canyon Pres. v. Bowers*, 632

19  F.2d 774, 784–85 (9th Cir. 1980) (concluding agency should have considered alternative of

20  widening an existing two-lane road, because it was a "reasonable and obvious" alternative to

21  building a new four-lane road).  Here, however, plaintiffs have not presented evidence that the

22  alley alternative was a viable or "reasonable" alternative.  When DFC members raised the idea at

23  a Section 106 consultation meeting on April 29, 2014, representatives of the City identified a

24  significant concern, that the buildings along the Mall would need to be reconstructed to face the

25  alleys.  *See* AR 003329.  When a DFC member inquired about the alley alternative at the

26  subsequent meeting on May 6, 2014, a representative responded that the alternative was

27  considered but was not economically feasible.  AR 003344.  The record does not provide more

28  detail or evidence that the idea was brought up again.  The court finds that reference to this

1    limited discussion of the alley alternative, absent evidence of its viability, is not sufficient to

2    demonstrate the idea was a "reasonable" alternative that Caltrans was required to consider under

3    Section 4(f).  *See Bowers*, 632 F.2d at 785.

4          For the foregoing reasons, plaintiffs have not shown Caltrans' rejection of

5    Alternatives 3 or 4 or the alley alternative was arbitrary or capricious.

6                    3.        Least Overall Harm and Mitigation Measures

7          Plaintiffs argue that even if there were no "feasible and prudent" avoidance

8    alternatives, Caltrans unreasonably rejected Alternatives 5 through 8 in its least harm analysis.

9    Pls.' Mot. Summ. J. at 17–18.  As with the avoidance alternatives analysis, plaintiffs argue the

10   stated purpose and need is overly narrow and Caltrans' decision was inappropriately influenced

11   by the TIGER grant application.  For the reasons discussed above, the court rejects these

12   arguments.  Caltrans provided a detailed, rational explanation supporting its conclusion that

13   Alternative 1 best meets the project's legitimate purpose and need.  *See* AR 005433–38.

14         Plaintiffs also argue in their reply brief that Caltrans' finding that the relative harm

15   for Alternative 1 is less than Alternative 8 and nearly the same as Alternative 7 is unreasonable.

16   *See* Pls.' Reply at 16.  The court finds to the contrary, that Caltrans' evaluation properly balanced

17   the factors listed under 23 C.F.R. § 774.3(c)(1), *supra*, and provided a detailed explanation of

18   why Alternative 1 causes the least overall harm.  Although Alternatives 7 and 8 would retain a

19   portion of the pedestrian mall, Caltrans found they would create a somewhat disconnected

20   pattern—a street with multiple dead ends intertwined with a pedestrian mall—that is not

21   consistent with the Fulton Mall Historic District's period of significance, which included a

22   downtown business district with local through-street.  AR 005426.  Because the majority of the

23   District's period of significance, 1914 through 1970, *see* AR 005297, predates the existence of the

24   pedestrian mall, Caltrans found the transition to a city street would more closely resemble the

25   original District.  AR 005426.  Caltrans found Alternatives 1, 7, and 8 would each allow for the

26   continuation of special events.  *Id.*  Caltrans found each of the alternatives would be equally

27   destructive to the Fulton Mall Historic Landscape, because they would each result in that

28   Landscape's inability to be considered an historic property eligible for inclusion in the NRHP.

1    AR 005425.  Alternative 7 would cause less harm to protected historic features than Alternative 8

2    because it would retain three of the six blocks of the Mall as pedestrian-only, instead of two

3    blocks under Alternative 8, and would retain five statues in their existing location, instead of three

4    statutes under Alternative 8.  *See* AR 005445.  Caltrans found none of the alternatives would

5    negatively impact the twelve individual historic buildings.  AR 005249.  Based on this analysis, it

6    was not unreasonable for Caltrans to find the relative harm to historic properties for Alternative 1

7    is less than Alternative 8 and nearly the same as Alternative 7.

8            For the foregoing reasons, plaintiffs have not shown Caltrans' conclusion that

9    Alternative 1 would cause the least overall harm was arbitrary or capricious.

10   VII.   <u>CONCLUSION</u>

11           The court concludes Caltrans' actions and determinations with respect to NEPA

12   and Section 4(f) were not arbitrary or capricious.  Accordingly, the court makes the following

13   orders:

14   (1)    The court DENIES plaintiffs' motion for summary judgment and GRANTS

15          defendants' motions for summary judgment as to the three APA claims.

16   (2)    The court DENIES AS MOOT plaintiffs' motion for a preliminary injunction

17          pending the court's ruling on the cross-motions for summary judgment.

18   (3)    The parties are ordered to meet and confer and file a joint statement no later than

19          **February 12, 2016** regarding how to proceed with the remaining claim under

20          California Government Code section 11135, for which the STAY currently in

21          effect is LIFTED.

22          IT IS SO ORDERED.

23   DATED:  January 12, 2016.

24

25   _____
     UNITED STATES DISTRICT JUDGE
26

27

28